JOHN M. GIEBELMAN, APPELLANT, v. FRED P. VAP, APPELLEE.

126 N. W. 2d 673

Filed February 28, 1964. No. 35517.

Nelson, Harding & Acklie, Charles F. Noren, and Kier, Cobb & Luedtke, for appellant.

Healey & Healey, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action for damages arising out of an automobile accident which occurred on September 7, 1959,

at approximately 10:40 p.m., at the intersection of the State Highway No. 2 cutoff and the extension of South Fortieth Street in Lancaster County. The case was tried to a jury resulting in a verdict for the plaintiff and fixing the amount of damages to be allowed him. Judgment was entered on the verdict. The plaintiff filed a motion for a new trial which was overruled. The plaintiff perfected appeal to this court.

The plaintiff's petition alleged in substance that immediately prior to the accident the plaintiff was operating his 1957 Ford station wagon in a westerly direction on the State Highway No. 2 cutoff which was protected by stop signs, at 10:40 p.m., on September 7, 1959; that Gerald L. Vap, the defendant's son, was operating defendant's vehicle in a northerly direction on the extension of South Fortieth Street in Lancaster County; and that the car owned by the defendant was a family car, furnished by the defendant for the use of his son Gerald L. Vap who was 18 years of age and a member of his household, and was operated with his consent. The petition then set forth several acts of negligence alleged to have been committed by the defendant's son in the use of the defendant's car at the time of the accident.

The defendant's answer admitted the occurrence of the accident at the time and place and between the parties mentioned in the plaintiff's petition; admitted that the wife of the plaintiff was a passenger in his car at the time of the collision and suffered injuries as a result thereof; that the three children of the plaintiff also suffered minor injuries in the accident; and that the damages incurred by the plaintiff's wife and children have been disposed of in prior actions of each of said parties. The defendant's answer alleged that the plaintiff was guilty of contributory negligence; and that the accident and injuries to the plaintiff, if any, were proximately caused by the careless and negligent acts of the plaintiff, and set forth various acts of negligence alleged to have been committed by the plaintiff. The answer

then denied each and every allegation of the plaintiff's petition except as specifically admitted in the answer, and prayed that the plaintiff's petition be dismissed.

By reply the plaintiff denied each and every allegation of the defendant's answer except those which admitted allegations in the plaintiff's petition.

For convenience we will refer to John M. Giebelman as plaintiff. Although Fred P. Vap is the father of Gerald L. Vap and is the defendant, we will refer to the latter as Gerald Vap or Gerald. State Highway No. 2 cutoff will be referred to as the highway.

There is no question but that the car driven by Gerald was owned by his father, Fred P. Vap, and was given to Gerald for his use while he was attending the University of Nebraska.

Gerald Vap testified that on the night of the accident he was driving a 1957 white 2-door Ford owned by his father and with his father's permission; that the car was in good mechanical condition with good tires and brakes and a clear windshield; and that both headlights worked. On this evening he had a date with him and he was driving the car at the time of the accident. He further testified that when he and his date left a moving picture theater he drove out Sixteenth Street to South Street, then over to Fourteenth Street and south beyond the penitentiary where he made a left turn and proceeded east and later proceeded north; that the accident happened about 10:30 p.m., while he was driving north on Fortieth Street; that it was possible that he had been on that street once or twice before; that he assumed there were stop signs but did not know exactly what distance on the road they were located; that half a mile south of where the accident occurred the surface of the road was gravel and this continued up to the highway; that the graveled road was a normal two-lane road; and that the weather that evening was clear and dry but not dusty. It was dark and the headlights were on. He could see possibly around 150 feet ahead of him. The

road half a mile south of where the accident occurred
is a gradual incline up hill going north. He further tes-
tified that he was traveling 40, 45, or 50 miles an hour;
that he did not see any sign that said "Warning—Stop
Ahead"; and that there was nothing to obstruct his vi-
sion as he came up the hill. He believed he saw a sign
on the right side of the road. He did not know where
it was with reference to the top of the hill. He got
almost to the sign and noted that it said "Stop." He
did not recall how far he was from the stop sign when
he first saw it. He saw the sign as soon as his head-
lights hit it, when he was 150 feet from the sign, and
he let up on the gas and decreased his speed to slow
down possibly 5 or 10 miles an hour, or to approximately
40 to 45 miles an hour. He did not recall if he applied
his brakes before that time. He did not see the head-
lights of a car approaching from the west or from the
east. He had applied his brakes gradually and thought
his wheels slid a little bit. The reason for applying the
brakes was because he recognized the stop sign. He did
not stop before he entered the highway at the time of
the accident. He did not know how fast he was going,
and he was not watching the speedomoter at that time.
He imagined the car was going 30 miles an hour as he ap-
proached the top of the hill driving close to the center of
the graveled road. He did not recall whether he veered
to the right or the left. He did not see the lights of the
plaintiff's car, nor did he remember seeing any lights.
After the accident he noticed that the whole front of his
car had been mashed in. It appeared that the car he was
driving hit the plaintiff's car on the left side of it. The
impact took place on the north half of the highway.
He saw skid marks after the accident as described by a
State Safety Patrol trooper. He did not recall that he
told this trooper that he had "run the stop sign." He
testified that he told the trooper that he did not mean
to run into the plaintiff's car and did not mean to hurt
anyone. He further testified that he did not run the stop

sign, but slid through it in his car. He recognized the stop sign about 150 feet away, but did not think that he could have stopped in that distance because he did not know his reaction time. As he approached the top of the hill his lights were beginning to level off. There was a milo field about 3 or 4 feet tall on the southeast corner of the intersection. He did not remember that there was a bank on the right or east side as he came up the hill, although an exhibit in evidence shows such a bank. There were no weeds or brush growing around the stop sign. He was not familiar with the highway in the area of the accident, nor did he know that there was a paved road from Forty-eighth Street over to U. S. Highway No. 77. He had been in that area once or twice before but did not recall that particular road.

On cross-examination Gerald Vap testified that he did not know on what street or road he was traveling before the accident; that as he was driving up the grade he had no knowledge that there was a stop sign at the top of that grade; that he might have been on that road once or twice with somebody else but was not driving on those occasions; that he was looking ahead as he drove along the road; and that when he became aware that there was a sign of some kind ahead he let up on the gas, and when he determined that it was a stop sign he applied the brakes immediately. He agreed with the state trooper that there were deep skid marks in the gravel. He further testified that the impact occurred in the intersection; that he did not see the plaintiff's car before the impact; and that the impact caused his car to spin around and come to rest facing east and balancing on a culvert in the northeast corner of the intersection.

The plaintiff testified that he lived in Scribner, Nebraska; and that at the time of the accident he lived at Crete, Nebraska, and owned a 1957 Ford 4-door station wagon. Referring to the date of the accident, he testified that he and his family, which consisted of his wife

and three children, came to Lincoln about 5 p.m., and went to his uncle's house where they stayed until 10 p.m.; that he drove down Fifty-sixth Street to Vine Street, then south on Forty-eighth Street to the highway; that his headlights were on; that he had been over this road before, anywhere from two to three times a week; and that this highway is protected by stop signs at all intersections. Just prior to the accident he was meeting a car coming from the west. He was on his own right side of the road, which would be the north side. His headlights were turned on low beam. He was traveling from 40 to 45 miles an hour and was going west. The other car was coming from the west going east. He saw the beam of the lights from that car. He dimmed his lights and all of a sudden there were two headlights coming at him from the left side. He was unable to do anything; he could not apply his brakes or turn his car. He testified: "It was there and that was it. Didn't have time. Didn't even see it." With reference to the point where the accident happened, he testified that he was about in the middle of the intersection at the time of the impact; and that he saw the car that collided with his car "just a split second before it hit." He further testified that there is a bank on the south side of the highway about car-top level, and there was a growing crop in that field; that the front end of the car Gerald Vap was driving hit the plaintiff's car broadside at approximately the front door; that he did not recall that he had time to swerve to the right or time to apply his brakes; and that his car was thrown upward, rolled over, and came to rest on its top facing west in the ditch. The record shows that this car was badly damaged. Immediately after the accident he was still in his car. He asked if everybody was all right and received no response. He crawled out and started to look for his family but could not find anybody. His wife and two children were thrown from the car and one of the children was in the car.

Elizabeth A. Rodgers testified that on September 7, 1959, about 10:30 p.m., she saw the accident at the corner of Fortieth Street and the highway while she was driving a 1954 Ford Mainliner. She and her two daughters came by way of U. S. Highway No. 77, then took the cutoff east toward Forty-eighth Street to go north from there to their home. The weather was hot, and there was a strong wind from the south that night. She was familiar with the point of Twenty-seventh Street and the highway which was paved with blacktop and runs east and west. She described the terrain as "hill and dale, up and down." She was driving east on the right or south side of the road with her headlights on. After she passed Twenty-seventh Street and reached the crest of a hill she noticed dust on the road at some distance in front and to the right of her. She did not know how far it was at that time. She observed a lot of dust on Fortieth Street south of the intersection and could see car lights reflected in the dust. As she started from the valley just below Fortieth Street and was part way up the hill, she could see the dust again, and told her children: "that fellow isn't going to stop." She took her foot off the gas and slowed her car enough to put her brakes on and come to a complete stop. Just about the same time the accident happened. She stopped about four car lengths from the intersection. With reference to the car that was coming north on Fortieth Street, she testified that that car was not going to stop so she stopped and just as she did the headlights came over the hill from the east and that was all she was aware of at the time, and that was all she could see. She could see the headlights of the car coming from the south on Fortieth Street, which kept coming up the hill, and coming quite fast. This car did not stop before entering the intersection and before the accident happened. This car was bouncing because of the type of road it was on. The accident happened directly in front of her while she was four car lengths west of the intersection. She was un-

able to recall what part of the two cars came together. She was familiar with the highway and knew that a person approaching the intersection of Fortieth Street on the highway from the east could not see Fortieth Street to the south because of the bank on the south side of the highway.

Lawrence Hanus testified that he was a member of the Nebraska Safety Patrol on September 7, 1959; that he went to the intersection of the extension of Fortieth Street and a road known as the State Highway No. 2 cutoff pursuant to a radio message; and that as he approached the intersection he observed two cars in the north ditch. One of these cars was a 1957 Ford station wagon which was upside down facing west. A woman was pinned underneath this car. He was unable to get to her. Trooper O'Neal arrived at the scene, and it was possible to remove the woman only after two wreckers arrived. The two wreckers were located in a prescribed manner because of the up and down contour of the ditch and to prevent the car, when it was lifted and moved, from going down on this woman. The ditch was 4 feet 10 inches deep. The banks on the ditch were rather steep. The 1957 Ford station wagon was lying upside down in the bottom of the ditch. There are several photographs in evidence relating to the scene at the time of the accident and the terrain of the area, some of which were taken the night of the accident and others the next day. There is also an exhibit showing the stop sign. This witness further testified that Gerald's car left skid marks which extended 35 feet south of the stop sign, continued 25 feet from the stop sign to the highway, and 15 feet on the highway, or a total of 75 feet. This witness further testified that he had a conversation with Gerald wherein Gerald told this witness that he ran the stop sign, that he was sorry he did it, and that he did not mean to. This witness also contacted Gerald at the hospital on September 8, 1959, and asked him what happened. Gerald said that he was going back to town on the

county road and started to go up hill; that he let up on the gas; that he saw the sign but did not know what the sign said, if it said to stop or to turn; that he could not read the sign; and that he put the brakes on and that was all he could remember. This witness further testified that there is a stop sign on Fortieth Street on the southeast corner of the highway intersection which applies to traffic proceeding north, and a stop sign on the northwest corner applicable to traffic going south on Fortieth Street. There is also a "Stop Ahead" sign on Fortieth Street down the hill south of the intersection.

V. R. O'Neal testified that he was a member of the Nebraska Safety Patrol and had occasion to go to the scene of the accident. He observed two cars, both of which were 1957 Fords, one a coach and the other a station wagon. The station wagon was west of Fortieth Street and north of the highway upside down in the the ditch. There was nothing to obstruct the view of the "Stop Ahead" sign on Fortieth Street applicable to traffic proceeding north on that street. This witness further testified that there are stop signs on both the north and south sides of the highway, and farther south there is a "Stop Ahead" sign; that the stop sign is octagon shaped, about 30 inches wide; that the warning sign to the south of the interesection is located on the east side of Fortieth Street along the edge of the gravel and is about 450 feet south of the intersection; that this sign is approximately 18 inches wide on the two points and probably 24 to 30 inches long on the two points; and that this sign is yellow with black trim and black letters and the stop sign is in the same colors. On redirect examination this witness testified that while they were waiting for the second wrecker to arrive Gerald Vap came up and said something about he did not mean to run the stop sign and did not mean to hit them, and a little later he heard Gerald say the same thing to trooper Hanus who was investigating the accident.

The plaintiff assigns as error that the trial court erred

in overruling the plaintiff's motion to instruct the jury that there was no evidence of contributory negligence on the part of the plaintiff as a matter of law.

If the defendant pleads that the plaintiff was guilty of contributory negligence the burden is upon him to prove that defense. See, Mundy v. Davis, 154 Neb. 423, 48 N. W. 2d 394; Garska v. Harris, 172 Neb. 339, 109 N. W. 2d 529. There are many other cases to the same effect.

The defendant relies upon Bell v. Crook, 168 Neb. 685, 97 N. W. 2d 352, 74 A. L. R. 2d 223. This is a case where the defendant went through a stop sign onto a highway and struck a truck. This court held that it was error for the trial court to submit alleged acts of contributory negligence in failing to decrease speed when approaching and crossing an intersection, and in failing to decrease speed as necessary to avoid colliding with another vehicle on or entering the highway. This court reversed the judgment of the trial court.

There is a distinct difference in the facts of the cited case and the instant case. In the cited case the accident occurred in broad daylight on a clear day. The intersection was known as Stone Corner, and it was level and free of obstructions to vision. Both vehicles involved in the accident were visible to each other at a distance of a quarter of a mile each way. There were no skid marks made by either vehicle concerned in the accident. At the intersection a stop sign had been installed on the west side, but had been mashed down and was displaced at the time of the collision of the vehicles.

Other cases are cited by the defendant wherein the factual situation is distinctively different from the facts in the instant case, and such cases are not applicable to the instant case.

We conclude the following to be applicable to the instant case.

In Arnold v. Lance, 166 Neb. 834, 90 N. W. 2d 814, this court held: "Where contributory negligence is pleaded

as a defense, but there is no evidence to support such defense, it is prejudicial error to submit that issue to the jury." See, also, Anderson v. Nielsen, 162 Neb. 110, 75 N. W. 2d 372; Fries v. Goldsby, 163 Neb. 424, 80 N. W. 2d 171.

With reference to a directed verdict, for which the plaintiff moved in the instant case, this court held in Farag v. Weldon, 163 Neb. 544, 80 N. W. 2d 568: "To justify the direction of a verdict, it is not necessary that there should be literally no evidence to go to the jury; it is sufficient if there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established." See, also, In re Estate of Frazier, 131 Neb. 61, 267 N. W. 181; In re Estate of Benson, 153 Neb. 824, 46 N. W. 2d 176.

In Mimick v. Beatrice Foods Co., 167 Neb. 470, 93 N. W. 2d 627, this court held: "Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination." See, also, Edgar v. Omaha Public Power Dist., 166 Neb. 452, 89 N. W. 2d 238.

From a review of the evidence and the authorities applicable heretofore set out, we conclude that the judgment of the trial court should be reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.